## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **EVENFLO COMPANY, INC.** | : | CASE NO. 3:23-cv-00378 |
| 3131 Newark Dr. | : | |
| Miamisburg, Ohio 45342 | : | Judge |
| | : | |
| Plaintiff, | : | **COMPLAINT FOR BREACH OF** |
| | : | **CONTRACT** |
| v. | : | |
| | : | |
| **WEBER DISTRIBUTION, LLC** | : | |
| **d/b/a WEBER LOGISTICS** | : | |
| c/o Sundoc Filings | : | |
| 3958 Brown Drive, Suite D | : | **JURY DEMAND ENDORSED** |
| Hilliard, Ohio 43026 | : | **HEREON** |
| | : | |
| Defendant. | : | |

Plaintiff Evenflo Company, Inc. ("Evenflo"), for its Complaint against Defendant Weber Distribution, LLC d/b/a Weber Logistics ("Weber"), states as follows:

### SUMMARY OF CLAIMS

1. This is an action for breach of a Warehouse Services Agreement ("WSA", attached as Exhibit 1) in which Weber – the owner of the warehouse which, for years, housed Evenflo goods imported into Southern California ports – wrongfully overcharged Evenflo for more than $3 million in improper and unearned fees over a span of about fifteen months. Through the parties' decade long relationship between 2012 and 2022, Evenflo and Weber agreed to certain services, rates and charges detailed in the WSA and various Addenda. But, in late 2021, Weber began breaching the WSA by failing to provide Evenflo the storage space agreed to, overcharging Evenflo for services under the WSA, and charging for unauthorized services outside the WSA.

4370062.4

2. As a result of Weber's numerous breaches, Evenflo now brings this action for breach of contract to recover the millions in damages Weber caused between approximately October 2021 and December 2022.

## THE PARTIES

3. Plaintiff Evenflo Company, Inc. is a corporation organized under the laws of Delaware, lawfully operating in the State of Ohio. Evenflo's principal place of business is 3131 Newark Drive, Miamisburg, Ohio.

4. Upon information and belief, Defendant Weber Distribution, LLC d/b/a Weber Logistics is a California limited liability company with its principal place of business at 13530 Rosecrans Avenue, Santa Fe Springs, California. Upon information and belief, the sole member of Weber Distribution, LLC is Weber Distribution Warehouse Inc. ("Weber Inc."). Weber Inc. is a California corporation with its principal place of business in Sante Fe Springs, California.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as the parties are citizens of different states and therefore completely diverse, and the amount in controversy exceeds $75,000.

6. The citizenship of Weber, as a limited liability company, is determined by the citizenship of its members. Upon information and belief, the sole member of Weber is Weber Inc., which is a California entity, maintaining its principal place of business in California. Weber's citizenship for purposes of diversity jurisdiction is thus California. As Evenflo is a Delaware entity with its principal place of business in Ohio, the parties are completely diverse.

7. Personal jurisdiction is proper in this Court over Weber because, among other things, Weber consented to the exercise of personal jurisdiction by an Ohio Court. That is, under

Section 19 of the WSA, Weber agreed that "[a]ny and all actions or proceedings concerning [the WSA] shall, if brought by any party hereto, be instituted and resolved in the courts of the State of Ohio or any federal court sitting in the State of Ohio." (WSA, § 19, p. 8). Weber has thus consented to the jurisdiction of any Ohio court.

8. Since personal jurisdiction is proper over Weber in Ohio, venue is proper in the Western Division for the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b)(3).

## FACTUAL BACKGROUND

### *Evenflo's Background*

9. Evenflo started as the "Pyramid Rubber Company" in Ravenna, Ohio in the 1920s. Ravenna, a small-town northeast of Akron, was a champion stomping ground for women's rights and thus made an ideal location for Evenflo to develop baby-feeding products that would allow women more freedom when it came to their children. Evenflo's patented inventions revolutionized the way parents feed their babies, and quickly made the company a leader in infant products.

10. Today, headquartered in Miamisburg, Ohio, Evenflo is one of the leading manufacturers of infant/juvenile essentials, including car seats, strollers, carriers, highchairs, bassinets, cribs, play yards, and ExerSaucers. Evenflo sells its products to some of the largest brick and mortar retailers in the country, including Target and Wal-Mart. Evenflo also has a large e-commerce presence through platforms such as Amazon.

11. In 2014, Evenflo became part of Goodbaby International Holdings Limited ("Goodbaby"). Goodbaby is a world leader in infant/juvenile and parenting products and maintains several top brands, including Evenflo and Exersaucer in North America, Cybex in Germany, and gb which is promoted globally.

*Evenflo Imports*

12. Evenflo imports consumer goods by sea through various ports. Evenflo's goods typically arrive at port floor-loaded in shipping containers provided by third-party shippers. Generally, one shipping container is the equivalent of 40 pallets of Evenflo goods.

13. When the shipping containers carrying Evenflo's goods are offloaded and clear customs at the port, a third-party logistics company delivers the containers from the port to a nearby warehouse. The shipping containers moved from the port to the warehouse require special chassis. The shipping containers, with their associated chassis, are delivered to the warehouse docks where the goods are unloaded and moved inside the warehouse. Once the containers are emptied, they are returned to the port, along with the chassis.

14. With Evenflo's goods moved into the warehouse, they are then available for shipment to either the brick-and-mortar retailers or directly to consumers who buy Evenflo goods through e-commerce platforms.

15. If the warehouse does not timely unload the shipping containers, the containers, full of goods, along with the chassis, are parked at warehouse storage yards until the warehouse can unload the goods. But the shipping containers and chassis are only permitted to be stored off port for a short period (e.g., 3 days), without additional charge. Once the standard allotted time for the containers and chassis to be off port is exceeded, Evenflo is charged daily fees for the shipping containers and chassis as they sit at a warehouse. These extra charges are known respectively as "Detention" and "Chassis" charges.

*Weber and the Warehouse Services Agreement*

16. Evenflo imports substantial goods through California ports. In 2012, Evenflo entered a letter of intent with Weber for the purpose of Weber becoming Evenflo's primary service provider for warehouse and distribution services in Southern California.

17. Weber touts itself as a leading third-party logistics (3PL) provider on the West Coast. Along with owning warehouses, Weber also provides port services to its customers for goods imported into the United States from Asia at major ports in both Los Angelos and Long Beach, California, as well as at other locations on the West Coast. Weber then transports products for its customers it offloads from the port directly to its warehouses.

18. On August 27, 2012, Evenflo and Weber executed the WSA, effective September 1, 2012. (Ex. 1). The initial terms of the WSA were for Evenflo goods to be shipped and stored only at Weber's warehouse located at 13473 Santa Ana Avenue, Fontana California ("Fontana Warehouse") and was to span three years.

19. At Appendix B to the WSA, Weber agreed to provide certain services:

> The Services to be rendered by Weber for [Evenflo] hereunder shall be the customary and necessary services to properly store, handle, ship and receive the [Evenflo goods], including related order processing, shipment documentation process including document retention and clerical support activity, security, environmental compliance, protection of proprietary information as set forth in the [WSA] and such other services as may be required and agreed to by the parties.

(WSA, App'x B, § I(A), p. 11). Section 4 of the WSA also required Weber to:

> [F]urnish all personnel necessary to perform the services under this Agreement. Weber shall perform all such services (i) in a good and workmanlike manner, (ii) in accordance with all specifications or plans provided by [Evenflo], and (iii) in accordance with all applicable law. Further, Weber represents and warrants that it has the requisite industry knowledge and know-how to perform the services, and has and maintains all appropriate licenses, to provide the services under this [WSA].

(WSA, § 4, p. 4).

20. The WSA extended far beyond its initial term. Over the years, Evenflo and Weber executed various written Addenda to the WSA reflecting each superseding agreement between the parties. These Addenda changed pricing and rate terms, increased the storage provided to Evenflo at the Fontana Warehouse, and made other material changes to the original agreement. In all, the parties executed 11 addenda to the WSA. Addenda 10 and 11 did not relate to the Fontana Warehouse but expanded the WSA to a second Weber warehouse in San Bernadino, California. A copy of the relevant addenda, Addenda 1-9, are attached at Exhibit 2.

21. Evenflo's need for warehouse space steadily increased. The demand for additional space resulted in Addendum 9, executed in October 2020, providing Evenflo increased storage space at the Fontana Warehouse. But starting shortly after execution of Addendum 9 and around the time Stellex Capital Management, a private equity firm, acquired Weber, Weber started breaching the WSA.

### *Weber Breached the WSA by Failing to Make Available Evenflo's Guaranteed Warehouse Space*

22. Under Addendum 9, Evenflo and Weber extended the WSA from October 1, 2020, through September 30, 2022, provided for a two-year renewal period after the initial term, and provided for new payment and service level terms.

23. Before Addendum 9, Weber had contractually guaranteed Evenflo warehouse space for up to 12,000 pallets of goods at any time. Addendum 9 increased the guaranteed warehouse space for Evenflo at the Fontana Warehouse to 15,000 pallets of goods at any time.

24. As for pricing, Addendum 9 established a "fixed footprint" of 12,000 pallets of goods at a fixed rate of $82,000 per month. (Ex. 2, Addendum 9). Meaning, if Evenflo stored 11,000 pallets of goods in a month, it paid the same rate as if it stored 12,000 pallets of goods.

4370062.4

25. Weber committed in Addendum 9 that Evenflo could increase its storage space up to 25% (or 3,000 additional pallets) at the Fontana Warehouse. For each additional pallet above the fixed footprint, Weber would charge Evenflo $6.90 per pallet. (*Id.*) Under this price structure, if Evenflo used all its guaranteed storage space in any month, Weber would charge Evenflo $102,920 in fees ($82,000 + ($6.90 x 3,000)).

26. Rarely did Weber provide Evenflo with the guaranteed space for 15,000 pallets of goods. This is not because Evenflo did not have the goods available to deliver to Weber's warehouse. It was because Weber failed to make the space contractually dedicated to Evenflo available for Evenflo's incoming goods. In other words, even though Evenflo regularly had a significant quantity of imported inventory bottled up in storage containers sitting in Weber's storage yards, Weber routinely failed to timely unload the shipping containers, thereby depriving Evenflo of its right to use its contractually dedicated space. At other times, Weber told Evenflo its allotted warehouse space for 15,000 pallets was full, when it was not.

27. Evenflo had enough goods staged in shipping containers stored in Weber's yard that beginning in October 2020, Evenflo could have consistently consumed all 15,000 pallet spaces guaranteed under the WSA. But because Weber failed to make the space guaranteed to Evenflo available, Evenflo was forced to keep its goods stored in shipping containers outside the Weber warehouse until Weber unloaded those containers. Thus, Evenflo incurred additional costs to store its goods (i.e., Chassis and Detention charges) when it should have only incurred warehouse fees to Weber under the WSA. Put differently, but for Weber's failure to make Evenflo's allotted warehouse space available, Evenflo would not have incurred these Chassis and Detention charges, which far exceeded the warehouse storage charges Evenflo would have otherwise incurred under the WSA.

4370062.4

28. Weber's performance failures materially breached the WSA and caused Evenflo damages. That is, Evenflo had to pay Detention and Chassis charges it would not have otherwise paid because of Weber's breach. Indeed, Evenflo was not given the benefit of the bargain to store its goods at a contractually agreed upon price at the Fontana Warehouse. Instead, it paid exponentially higher costs while its good sat bottled up in storage containers for prolonged periods.

29. Evenflo reasonably believes Weber's failure to make Evenflo's guaranteed space available between October 2021 through December 2022 caused damages exceeding $2.1 million.

*Weber Breached the WSA by Improperly Assessing Storage Fees Against Evenflo*

30. Closely related to its failure to provide Evenflo with the guaranteed storage space, Weber also failed to properly count and charge for the pallets it did unload.

31. Over the life span of the WSA and through the various Addenda, Weber charged Evenflo either a specific monthly price per pallet or a monthly storage fee for a certain number of pallets. For example, in Addendum 1, Evenflo agreed to pay $5.25 for each pallet stored at the Fontana Warehouse as of the first of each month. (Ex. 2, Addendum 1). Evenflo would then pay $5.25 for each pallet received during any month. (*Id.*) This price per pallet framework continued for the next several Addenda. (*See* Ex. 2, Addendum 2, App'x C; Addendum 5, App'x C; Addendum 6, App'x C; Addendum 7, App'x C).

32. With Addendum 9, Evenflo agreed to pay a flat fee ($82,000) for up to 12,000 pallets per month and then another monthly fee for up to 3,000 additional individual pallets. (*Id.*, Addendum 9). Meaning, as of October 1, 2020, under the new terms for the WSA, if, on the first business day of the month, Evenflo had less than 12,000 pallets in the Fontana Warehouse, then Weber still charged Evenflo the base $82,000.

33. That said, more than once, Weber charged Evenflo for "additional storage costs" even though Evenflo did not have more than 12,000 pallets in the Fontana Warehouse on the first business day of the month. These overcharges occurred over several months between October 2021 and the end of 2022.

34. As an example, according to Weber's own warehouse data, on January 4, 2021, the first business day of the month, Weber had on hand 9,838 Evenflo pallets. Thus, there would be no Initial or Renewal Storage charges for January 2021 except for the fixed charge of $82,000 for up to 12,000 pallets on hand.

35. The same is true for February through October 2021 because, according to Weber's data, it never had on hand more than 12,000 pallets on the first day of each of these months. Likewise, on December 1, 2021, the first business day of that month, Weber had 11,871 pallets on hand so there should be no additional Initial or Renewal Storage charges for December 2021.

36. Turning to 2022, Weber's data reveals it did not have more than 12,000 pallets on hand on the first business day of January, June, or December 2022.

37. Yet for most, if not all these months, Weber impermissibly charged Evenflo more storage fees. As an example, on June 1, 2022, the first business day of the month, Weber had 11,405 pallets on hand. Thus, Weber did not have 12,000 pallets on hand on the first business day of the month so there would be no storage charges for June 2022 beyond the flat rate charge for 12,000 spaces. But Weber issued a June 30, 2022, Invoice reflecting 3,229 pallets charged at $7.12 each for a total of $22,990.48. The charge is described as "Additional storage as of June 2022 – 3,229". Weber overcharged Evenflo for storage space in June 2022 by $22,990.48.

38. As a result, Weber charged and Evenflo paid improper storage fees beyond what the parties agreed to in the WSA.

***Weber Breached the WSA in Other Ways***

39. This is not the limit of the problems Evenflo experienced with Weber after 2020.

40. Besides promising to provide Evenflo guaranteed warehouse space for up to 15,000 pallets monthly and to charge for those spaces as detailed in the Addendum, Weber promised to:

   a. "[P]rovide adequate storage space within the [Fontana Warehouse.]" (WSA, § 2, p. 3);

   b. "[M]anage all receiving, storage, inventory control and shipping of [Evenflo's goods.]" (WSA, App'x B, § I(D), p. 11);

   c. "[P]romptly receive and unload inbound deliveries." (WSA, § II(A), p. 12); and,

   d. Make "[a]ll scheduled inbound shipments . . . available for shipment within twenty-four (24) hours at the [Fontana Warehouse.]" (*Id.*)

41. Weber did not live up to these promises. It did not provide Evenflo with the storage space it promised; it did not "promptly" receive Evenflo's shipments to move and store Evenflo's goods at the Fontana Warehouse as agreed; and Weber did not make sure Evenflo's shipments were at the Fontana Warehouse within 24 hours as required in the WSA.

42. What is more, upon information and belief, Weber oversold its warehouse space which in turn caused Weber to not provide Evenflo with its guaranteed space, thus requiring Evenflo's goods to sit in shipping containers at significant expense to Evenflo. Put differently, Weber did not permit Evenflo to use its guaranteed warehouse space because Evenflo's space was used by other Weber customers.

43. But Weber's over sale of space and its general mismanagement compounded Weber's other failures under the WSA. In this sense, Weber reported to Evenflo that it did not have enough material handling employees to unload and otherwise move Evenflo's goods. That is, Weber's operational issues congested its own docks, thus delaying Weber's employees from unloading Evenflo's goods. As a result of Weber's failure to adequately staff its Fontana

Warehouse, Weber started charging Evenflo other fees that were in most cases not authorized under the WSA and in other cases not contemplated at all by the WSA.

44. The excess and unauthorized fees include, but are not necessarily limited to:

   a. Storage charges;
   b. Personnel charges, such as for overtime and weekend work;
   c. Overtime charges;
   d. Material handling personnel and equipment charges;
   e. Charging for pallets without approval;
   f. DePicking charges;
   g. Special project charges;
   h. Charging for Rollplay products by misclassifying Evenflo travel systems;
   i. Yard Hostling charges; and
   j. Unauthorized rate increases.

45. Evenflo estimates it was overbilled by as much as $900,000 for these excess and unauthorized charges.

46. Weber's invoices are in some respects difficult to understand, including charges that are indecipherable. In as much as the Weber invoices detailed these excess and unauthorized charges, Evenflo raised these issues with Weber. In some cases, Weber adjusted, at least for a short period before reverting to its incorrect billing. In other instances, Weber outright refused to correct its billings and demanded Evenflo pay the excess and otherwise unauthorized charges.

47. As yet another example of problems Evenflo faced from Weber, Weber improperly placed "ghost labels" on certain products that were then rejected from the retailer (Buy Buy Baby). Evenflo then had to pay charges to Buy Buy Baby as a result and Weber still charged Evenflo shipping charges and other fees. Weber's delay and lack of communication on this problem directly caused Evenflo to incur these additional expenses.

48. Related to this, Weber also routinely failed to file tickets for missed routed pickups. Because Weber would not log this in the system as required, Evenflo had no idea an order had not

4370062.4

shipped timely until it received a customer complaint. So not only would Evenflo's goods just sit, Evenflo would also be hit with chargebacks from the customers.

49. By 2022, it appeared that Weber, under its new ownership, was not satisfied with the terms of the WSA and was undertaking a campaign to try to force Evenflo to pay for rates and services not authorized or permitted under the WSA. In other words, Weber was trying to force Evenflo to modify the terms of the WSA. Evenflo refused to be bullied and insisted the parties honor the WSA in the same way they had done for nearly a decade.

*Weber Terminates the WSA*

50. In Addendum 9, the parties agreed to extend the WSA through September 30, 2022. The parties also agreed the WSA would renew for another 2 years if neither party provided 60 days' notice before September 30, 2022 of its choice not to renew.

51. Despite the 60-day contractual notice requirement, on September 30, 2022, the final day of the WSA's term, Weber purported to terminate the WSA under Section 2 of Addendum 5, which permitted either party to terminate the WSA with 90 days' notice.

52. Thus, Weber terminated the WSA as of December 29, 2022. Weber threatened that if Evenflo did not have its goods out of Weber's warehouse by the end of 2022, it would charge Evenflo rates at a 200% increase to Weber's then current warehouse storage rates.

53. Evenflo was forced to move all its goods from the Fontana Warehouse and find a new warehouse facility within that time, which it managed to do.

54. During this time, Weber proposed addendum 12, which would have incorporated into the WSA provisions authorizing those excess and unpermitted fees Weber was charging Evenflo. Evenflo rejected Addendum 12.

4370062.4

## COUNT I
### *Breach of Contract – Failure to Provide Guaranteed Warehouse Space*

55. Evenflo incorporates all of the preceding allegations as if set forth here.

56. Evenflo and Weber entered into the WSA. The WSA is an enforceable contract which dictated and controlled the business relationship between the entities.

57. Each of the Addenda Evenflo and Weber executed are enforceable extensions of the WSA.

58. Under Addendum 9, Weber guaranteed Evenflo space in the Fontana Warehouse to hold up to 15,000 pallets per month.

59. Weber did not provide Evenflo the guaranteed space in which to store its pallets. As a result, Evenflo incurred Detention and Chassis charges it would not have otherwise incurred but for Weber's failure to provide Evenflo with the contractually promised space.

60. Evenflo fully performed its obligations and commitments under the WSA and all Addenda thereto.

61. Weber breached the WSA by failing to provide Evenflo with guaranteed space for its goods consistent with Addendum 9.

62. As a direct and proximate result of Weber's breach of the WSA and Addendum 9's storage space guarantees, Evenflo has been damaged in an amount to be proven at trial but reasonably believed to exceed $75,000, exclusive of costs and interest.

## COUNT II
### *Breach of Contract – Impermissible Storage Charges*

63. Evenflo incorporates all of the preceding allegations as if set forth here.

64. Addendum 9 is an extension of the WSA and is a fully enforceable contract.

4370062.4

65. Addendum 9 required Weber to bill a fixed rate to Evenflo for the use of 12,000 pallets each month at a rate of $82,000. If Evenflo exceeded 12,000 pallets as of the first business day of the month, Weber was to bill Evenflo $6.90 for each pallet, plus $6.90 for each additional pallet received throughout the month.

66. Between October 2021 and December 2022, Weber charged Evenflo for additional storage space contrary to the WSA and Addendum 9.

67. These storage charges violate the WSA and Addendum 9.

68. Evenflo fully performed under the WSA and all Addenda thereto.

69. Weber breached the WSA and Addendum 9 by charging storage fees inconsistent with the parties' contract.

70. As a direct and proximate result of Weber's breach of the WSA related to these unauthorized and improper storage charges, Evenflo has been damaged in an amount to be proven at trial but reasonably believed to exceed $75,000, exclusive of costs and interest.

## COUNT III
### *Breach of Contract – Other Excess and Unauthorized Charges*

71. Evenflo incorporates all the preceding allegations as if set forth here.

72. Addendum 9 is an extension of the WSA and is a fully enforceable contract.

73. Addendum 9 established certain rates Weber may charge Evenflo for certain services under specified circumstances. As an example, Weber could charge Evenflo "hourly rates incurred for special activities approved by Evenflo in writing that go beyond typical administrative and warehouse functions[.]" (*Id.*)

74. Weber routinely charged Evenflo for typical warehouse functions, such as standard labor for material handling employees, clerical and administrative staff, and supervisory personnel. None of these charges were for "special activities approved by Evenflo in writing" or otherwise.

75. As another example, Weber would routinely charge Evenflo for "Yard Hostling", which is the movement of shipping containers around the Fontana Warehouse. This work is standard for warehouse services. None of these charges were for "special activities approved by Evenflo in writing" or otherwise.

76. Weber's invoices teem with incorrect, excess, and unauthorized charges, which are categorized as:

   a. Storage charges;
   b. Personnel charges, such as for overtime and weekend work;
   c. Overtime charges;
   d. Material handling personnel and equipment charges;
   e. Charging for pallets without approval;
   f. DePicking charges;
   g. Special project charges;
   h. Charging for Rollplay products by misclassifying Evenflo travel systems;
   i. Yard Hostling charges; and
   j. Unauthorized rate increases.

77. Copies of the Weber invoices Evenflo paid that include these inappropriate charges are not attached because they are too voluminous and because Weber created the invoices and therefore already possesses the documents.

78. Evenflo fully performed under the WSA and all Addenda thereto.

79. Weber breached the WSA and Addendum 9 by charging as detailed above, which is contrary to the parties' contract.

80. As a direct and proximate result of Weber's incorrect, excess, and unauthorized charges in breach of the WSA, Evenflo has been damaged in an amount to be proven at trial but reasonably believed to exceed $75,000, exclusive of costs and interest.

**WHEREFORE**, Plaintiff Evenflo Company, Inc. respectfully prays for the following relief:

A. Judgment against Defendant Weber Distribution, LLC d/b/a Weber Logistics on Count I of the Complaint in an amount to be proven at trial, but reasonably believed to exceed $75,000;

B. Judgment against Defendant Weber Distribution, LLC d/b/a Weber Logistics on Count II of the Complaint in an amount to be proven at trial, but reasonably believed to exceed $75,000;

C. Judgment against Defendant Weber Distribution, LLC d/b/a Weber Logistics on Count III of the Complaint in an amount to be proven at trial, but reasonably believed to exceed $75,000;

D. Pre- and post-judgment interest;

E. Costs incurred as a result of maintaining this action; and

F. Any and all other legal or equitable relief this Court finds to be fair and just.

Respectfully submitted,

/s/ Toby K. Henderson
Toby K. Henderson          (0071378)
Kaitlyn C. Meeks           (0098949)
SEBALY SHILLITO + DYER
A Legal Professional Association
1900 Stratacache Tower
40 North Main Street
Dayton, OH  45423
937/222-2500
937/222-6554 (fax)
thenderson@ssdlaw.com
kmeeks@ssdlaw.com
*Attorneys for Plaintiff*

## JURY TRIAL DEMAND

Plaintiff Evenflo Company, Inc. demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b).

/s/ Toby K. Henderson
Toby K. Henderson

4370062.4